UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No.  4:18 CR 411 SNLJ (JMB) |
| ) | |
| HAKEEM VALENTINE, ) | |
| ) | |
| Defendant. ) | |

**REPORT AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE**[1]

Currently before the Court is Defendant Hakeem Valentine's Motion to Suppress Evidence.[2]  (ECF No. 23)  The government opposes Valentine's motion.  (ECF No. 24)  For the reasons outlined below, the undersigned recommends that the Court deny Valentine's motion.

**INTRODUCTION AND BACKGROUND**

On May 10, 2018, the Grand Jury charged Valentine with one count of being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g).  The charges flow from an April 17, 2018, traffic stop during which officers with the St. Louis Metropolitan Police Department (SLMPD) seized three handguns from a car in which Valentine was a passenger.  In his motion to suppress, Valentine suggests that the police lacked lawful authority to stop the car, and even if lawful, the police unlawfully extended the duration of the stop rendering any search of the car

---

[1] Pretrial matters have been referred to the undersigned United States Magistrate Judge, under 28 U.S.C. § 636(b).

[2] Valentine's motion refers to both physical evidence and statements.  At the evidentiary hearing, defense counsel advised the Court that no known, arguably suppressible statements were taken from Valentine.

unconstitutional.  The government contends that the police had probable cause to stop the car for a traffic violation and that reasonable suspicion justified extending the stop to search the car for weapons.

On January 3, 2019, the Court held an evidentiary hearing.  Valentine was present and represented by Assistant Federal Public Defenders Brocca Morrison and Kayla Williams.  The government was represented by Assistant United States Attorney Thomas Mehan.  Also present were the two SLMPD Officers who conducted the traffic stop in question—Officers Michael Joyner and Benjamin Lacy.  The government presented the testimony of Officer Joyner and Valentine presented the testimony of Officer Lacy.  Ms. Morrison cross-examined Officer Joyner extensively.  Valentine submitted one exhibit—Defendant's Exhibit A—a DVD that included copies of the relevant radio transmissions and dashboard camera video (hereinafter "dash cam") from the officers' patrol car.  At the conclusion of the hearing, Valentine requested leave to submit a post-hearing memorandum after receiving a transcript of the evidentiary hearing.  Both parties have filed their respective post-hearing memoranda.  (ECF Nos. 32, 34, 37)

Based on the testimony and evidence adduced at the evidentiary hearing, having had the opportunity to observe the demeanor and evaluate the credibility of the witnesses, having carefully reviewed Defendant's Exhibit A, and having fully considered the parties' arguments and written submissions, the undersigned makes the following findings of fact, conclusions of law, and recommendation.

## **FINDINGS OF FACT**

Michael Joyner is an SLMPD patrol officer.  At the time of the evidentiary hearing, he had been an officer for six years.  Officer Joyner was on duty on the evening of April 17, 2018, and was patrolling the First District in a marked patrol car with Officer Lacy.

Officer Joyner explained that the officers' patrol car was equipped with a dash cam video recording system. He generally described his understanding of what events trigger a recording. Although the dash cam system is always operating, it does not preserve or save recordings until some triggering event causes the recording to be preserved. Officer Joyner's testimony suggested that certain events, such as activating the flashing lights, would trigger the dash cam to capture and preserve records, including a portion of time before the trigger event. The dash cam recording submitted in this case as Defendant's Exhibit A is consistent with Officer Joyner's general description.

At around 8 p.m. on April 17th, in the area of the 3200 block of Keokuk, Officers Joyner and Lacy observed a Chevrolet Impala stopped at the curb. A person on foot was talking to someone in the Impala. Officer Joyner explained that as the patrol car passed the Impala, the person on foot took off south through a gangway. Officer Joyner clarified that the person did not run, but rather walked away with "a purpose." The officers drove within feet of the Impala and noticed that it had an expired temporary license tag. The officers elected not to stop the Impala for the tag violation at that time and drove to an alley to look for the person on foot.

The officers drove to the alley but did not find the person on foot. As the officers turned down the alley, however, a vehicle entered the alley from the opposite direction. As the vehicles got closer, the officers realized that the other vehicle was the Impala they had just seen. Although the dash cam video in Officer Joyner's patrol car did not capture the initial encounter with the Impala on Keokuk, it captured the entire sequence of events in the alley.

After seeing the Impala in the alley, the officers "spotlighted" it and activated their emergency lights to conduct a traffic stop of the vehicle. Officer Joyner testified that, before the Impala stopped, it backed up and then started to try to go around the officers' vehicle. The

Impala had four occupants—two in the front and two in the back.  Valentine was seated in the rear seat on the passenger side.

Officer Joyner exited the patrol car and approached the driver's side of the Impala.  Officer Joyner testified that he could see the driver of the Impala moving his arm and it looked to Officer Joyner as if he was trying to conceal something on the floorboard.  Officer Joyner explained that he assumed anything someone might try to conceal could be dangerous, so he shouted a command to show hands.  Officer Joyner also abruptly stopped his approach to the Impala and raised his left hand.  Although not immediately, all four occupants obeyed the command to raise their hands.  Officer Joyner then resumed his approach and removed the driver from the vehicle, secured him, and moved him to the rear of the vehicle.  Officer Joyner testified that, in the process of confronting the driver and removing him from the Impala, he observed a handgun on the floorboard.

While Officer Joyner was dealing with the driver, Officer Lacy approached the Impala from the passenger side.  The passenger side of the vehicle was positioned somewhat snuggly against a fence or wall in the alley, but there was room for a door to open and for a passenger to get out of the Impala.  Officer Lacy testified that it appeared to him as though the person in the back seat on the passenger side (later identified as Valentine) was trying to exit the car.  Officer Joyner testified that he heard Officer Lacy shouting at someone to keep the door closed.  The dash cam video shows Officer Lacy proceed directly to the passenger side rear door and, after a few moments, remove Valentine and secure him at the rear of the vehicle with the driver.

After Valentine was removed from the Impala, the other back seat passenger was removed and secured at the back of the vehicle.  The final passenger removed was the front seat passenger.  All four passengers were kept at the rear of the Impala and one officer remained to

4

watch the removed passengers while the other officer looked in the vehicle.

The first area searched was the area around the driver's seat. The dash cam video shows Officer Joyner lean fully into the Impala with a flashlight and then emerge with what appears to be papers and a handgun. Officer Joyner then appears to return the patrol vehicle and out of view of the dash cam for a while. After Officer Joyner returns into view, the dash cam shows Officer Lacy search the passenger side of the Impala, first from the front seat and then from the back seat. It appears in the dash cam video that Officer Lacy is on his knees on the front passenger seat, leaning between the front passenger seat and the driver's seat, and facing the rear passenger compartment. Officer Lacy then stepped back out of the Impala and opened the rear passenger side door and leaned into the rear passenger side compartment. The dash cam video shows Officer Lacy emerge later from the Impala and walk back toward the patrol car carrying two handguns.

Additional findings of fact and relevant credibility determinations are included in the discussion below.

## DISCUSSION, CONCLUSIONS OF LAW, AND RECOMMENDATION

Valentine asks the Court to suppress the evidence seized as a result of the April 17, 2018, traffic stop by Officers Joyner and Lacy. Valentine suggests that the initial stop was not lawful, contending that the officers may not have been able to see the expired temporary license plate. Valentine also takes issue with the officers' account of seeing someone walk away from the Impala. Valentine argues that, even if the traffic stop was proper, any search was conducted after the stop was extended unlawfully. Therefore, according to Valentine, the physical evidence seized from the Impala must be suppressed.

The government counters that the officers conducted a lawful traffic stop of the Impala

5

based on the license plate violation and that the officers had reasonable suspicion to extend the traffic stop based on the totality of the circumstances.

The first issue the Court must resolve is whether the police lawfully stopped the Impala in which Valentine was a passenger. "A traffic stop is considered a seizure for Fourth Amendment purposes." United States v. Guevara, 731 F.3d 824, 827 (8th Cir. 2013). See also United States v. Ameling, 328 F.3d 443,446 n.3 (8th Cir. 2003) (explaining that "a passenger … may still challenge the stop and detention and argue that the evidence should be suppressed as the fruits of [an illegal seizure]") (citation omitted). To justify such a seizure, "officers need only 'reasonable suspicion' – that is, 'a particularized and objective basis for suspecting the particular person stopped' of breaking the law." Heien v. North Carolina, 135 S. Ct. 530, 536 (2014) (quoting Navarette v. California, 134 S. Ct. 1683, 1687-88 (2014)).

An officer's decision to stop a car is "reasonable" for Fourth Amendment purposes, if the officer has "probable cause to believe that a traffic violation has occurred." Whren v. United States, 517 U.S. 806, 810 (1996) (citing cases). The seriousness of the violation is not relevant. Rather, "[a]ny traffic violation, however minor, provides probable cause for a traffic stop." United Sates v. Bloomfield, 40 F.3d 910, 915 (8th Cir. 1994) (en banc) (citation omitted). An officer's subjective motivations for stopping the vehicle are not relevant, "even if the officer conducted the valid traffic stop as a pretense for investigating other criminal activity." United States v. Hambrick, 630 F.3d 742, 746 (8th Cir. 2011); see also Whren, 517 U.S. at 812-13 (explaining that "[s]ubjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis"). Thus, a traffic stop supported by probable cause "is valid even if the police would have ignored the traffic violation but for their suspicion that greater crimes are afoot." United States v. Thomas, 93 F.3d 479, 485 (8th Cir. 1996). It is the government's

6

burden of showing that probable cause existed to justify the traffic stop.  United States v. Andrews, 454 F.3d 919, 922 (8th Cir. 2006).

With the foregoing principles in mind, the undersigned finds that Officers Joyner and Lacy had probable cause to stop the Impala for a license plate violation.  The officers needed no justification to initially drive by and observe the Impala and its license plate during their patrol.  Valentine does not argue that the temporary license plate was expired at the time, but he suggests that the officers did not actually observe the expired plate.   Officer Joyner testified that when he initially encountered the Impala, it was running and stopped curbside.  Officer Joyner explained that his vehicle passed the Impala within feet and he could see the date on the temporary tag in large numbers.  The undersigned credits Officer Joyner's testimony regarding his observations concerning the expired license plate.  Therefore, the officers had probable cause to stop the Impala for a traffic violation.

Having concluded that the traffic stop was valid, the next issue the Court must address is the duration of that stop and the subsequent seizure of firearms from the Impala.  Although Valentine has standing to challenge the seizure of the Impala, as a "mere passenger" he generally "does not have standing to challenge [the] vehicle search."  United States v. Russell, 847 F.3d 616, 618 (8th Cir. 2017) (citations omitted).  It is Valentine's burden to prove his reasonable expectation of privacy in the property searched (the Impala), see id., and he did not offer any facts to support a conclusion that he owned or had other rights relative to the Impala.  Recognizing this impediment, Valentine's arguments do not directly challenge the search but focus rather on the duration of the seizure.

"[S]earches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment—subject only to a few

7

specifically established and well-delineated exceptions." United States v. Goodwin-Bey, 584 F.3ed 1117, 1119 (8th Cir. 2009) (citation and internal quotations omitted), cert. denied, 559 U.S. 961 (2010).  One such exception, "the reasonable suspicion of dangerousness exception," is relevant to Valentine's case.  Id. (citing Terry v. Ohio, 392 U.S. 1 (1968)).  The Terry stop "exception[] appl[ies] to searches of vehicles under Michigan v. Long, 463 U.S. 1032 (1983)." Id.; see also United States v. Collins, 883 F.3d 1029, 1032 (8th Cir. 2018).  Thus, during a Terry stop of a vehicle, officers may conduct a limited search for weapons if there is reasonable suspicion to conclude that a suspect is armed and poses a danger, a mere hunch is not sufficient. Id.; see also Terry, 392 U.S. at 29; United States v. Morgan, 729 F.3d 1086, 1089 (8th Cir. 2013) ("Once reasonable suspicion is established, … officers may conduct a protective search of a vehicle's interior, whether or not the occupants have been removed …, because 'if the suspect is not [arrested], he will be permitted to reenter his automobile, and he will then have access to any weapons inside.") (quoting Long, 463 U.S. at 1053).  Thus, the police may search "the passenger compartment of an automobile, limited to those areas in which a weapon may be placed or hidden … if the police officer possesses a reasonable belief … the suspect is dangerous and may gain immediate control of weapons."  Goodwin-Bey, 584 F.3d at 1120 (quoting Long, 463 U.S. at 1049).  The duration of such stops may be no longer than "necessary to effectuate the purposes of [the] investigative stop."  United States v. Mosley, 878 F.3d 246, 254 (8th Cir. 2017) (citation and quotation omitted).

Citing United States v. Gray, 213 F.3d 1000 (8th Cir. 2000),Valentine argues that the police lacked reasonable suspicion to further detain the Impala, noting that a person who simply walks away from police presence does not establish a reasonable suspicion.  Valentine is correct, and the Eighth Circuit recently explained that "[t]hough a person's unprovoked 'flight' from the

8

police may be considered in the reasonable-suspicion calculus, a person's decision during a consensual police encounter 'to ignore the police and go about his business' cannot." United States v. Sykes, 914 F.3d 615, 618 (8th Cir. 2019).  In this case, however, this Court need not decide if the pedestrian who walked away from the Impala with "a purpose" engaged in unprovoked flight from the police or simply chose to ignore the police.  Officers Joyner and Lacy encountered circumstances that involved considerably more than someone just walking away from them.  And it is well-established that reasonable suspicion requires consideration of the totality of the circumstances, not a "divide-and-conquer" analysis of each fact and circumstance in isolation.  See United States v. Collins, 883 F.3d 1029, 1032 (8th Cir. 2018) (quoting United States v. Quinn, 812 F.3d 694, 698 (8th Cir. 2016)).  The judicial assessment of reasonable suspicion also considers police officers' experience, training, and inferences that "might well elude an untrained person."  United States v. Arvizu, 534 U.S. 266, 273 (2002); see also United States v. Hurd, 785 F.3d 311 (8th Cir. 2015) (quoting Arvizu).

     A consideration of the totality of the circumstances in this matter leads to the conclusion that Officers Joyner and Lacy had reasonable suspicion to prolong the traffic stop and conduct an investigative search for dangerous weapons.  When Officers Joyner and Lacy encountered the Impala the second time, it was at night,[3] in an alley where the officers thought they might find the subject on foot—they were not initially looking for the Impala.  The dash cam video shows that the officers entered the alley just before the Impala turned down the alley from the opposite direction.  The officers testified that the Impala appeared to back up or reverse briefly and then tried drive past the patrol vehicle, as if trying to avoid the police.

---

[3] There is no evidence in the record to establish whether the alley was in a known high crime area.  Such a factor, therefore, has not been considered by the undersigned in this discussion.

9

To the undersigned, the dash cam video does not conclusively show or refute that the Impala backed up as it encountered the officers' vehicle. It is difficult to be certain because the Impala and patrol vehicle approached each other from opposite directions, at night, in an alley, with lights on. The undersigned has reviewed the dash cam video numerous times at different replay speeds and using different screen sizes, and has considered the lighting and limited viewpoint depicted in the dash cam video. It appears to the undersigned that the Impala may have initially attempted to back up shortly after it entered the alley and again as it approached closer to the patrol vehicle. Based on the available evidence, therefore, the undersigned credits the officers' testimony that they observed the Impala attempt to reverse and back up as the vehicles approached each other in the alley.

Even if the Impala did not attempt to reverse, other information and evidence supports a conclusion that the officers had a reasonable suspicion to extend the stop of the Impala beyond the time necessary to address the expired license plate violation. First, the dash cam clearly shows the Impala pull to the driver's right in what an officer could reasonably view as an attempt to drive past and elude the patrol vehicle. Second, it was evening and the officers had just seen the Impala stopped on a nearby street engaged with a person on foot, and the officers observed that person leave the area with "a purpose" as their patrol vehicle approached. While the police were looking in an alley for the person on foot, the Impala drove down that very same alley. This is the type of coincidence that a trained officer might find suspicious. Third, and perhaps most importantly, Officer Joyner testified that as he approached the Impala at the outset of the traffic stop, he observed the driver making movements Officer Joyner considered to be suspicious and indicating that the driver was trying to conceal an object such as a weapon. All of these circumstances, taken together, would give an officer an objective reasonable suspicion that

criminal activity may be afoot and one or more occupants may be armed.

The undersigned credits Officer Joyner's testimony regarding the driver's movements. The timing and overall circumstances are significant. The police encountered the Impala unexpectedly, at night, in an alley, while looking for a person on foot who was recently seen speaking with occupants of the Impala. Officer Joyner's testimony regarding the driver's movements is substantially corroborated by the dash cam video.[4] The dash cam video shows that, as the Impala came to a stop, the driver leaned to his right side, and then abruptly looked back around toward the rear passenger compartment before he looked forward again and swayed back and forth in his seat. The video further shows that, as Officer Joyner approached the Impala on foot, the driver looked down and his right hand does not appear to be on the steering wheel. At precisely this point in the video, Officer Joyner abruptly stopped his approach and raised his left hand. Officer Joyner did not resume his approach to the Impala until after the occupants raised their hands. All of this video evidence is consistent with Officer Joyner's testimony that he observed the driver move suspiciously so he directed the occupants to show their hands.

Based on the foregoing facts and circumstances, the undersigned finds that, no later than the time at which Officer Joyner approached the vehicle and raised his left hand (i.e., after he observed conduct indicating that the driver attempted to conceal something), the officers had objectively reasonable concerns for their safety and reasonable suspicion to extend the traffic stop to remove the occupants and search the Impala for weapons. See United States v. Evans, 830 F.3d 761, 766 (8th Cri. 2016) (citing Long, 463 U.S. at 1049), cert. denied, 137 S. Ct. 839

---

[4] Valentine argues that the dash cam video is the best evidence and contends that the driver made no suspicious movements. The undersigned agrees that the dash cam provides strong evidence, but believes that, in view of the totality of the circumstances, that evidence supports Officer Joyner's testimony.

11

(2017); see also United States v. Reddick, 910 F.3d 358, 961 (8th Cir. 2018) ("Law enforcement officers are entitled to evaluate the totality of the circumstances … and they may possess reasonable suspicion even when innocent explanations can be put forward for each individual circumstance.") (citations omitted); United States v. Pope, 910 F.3d 413, 417 (8th Cir. 2018) (explaining that, when officers confront someone they reasonably believe to be armed, "it remains reasonable to frisk that person" even after that person has been secured with handcuffs); United States v. Beatty, 170 F.3d 811, 813 (8th Cir. 1999) (explaining that, during a lawful traffic stop, the police may order the occupants to exit the vehicle).

As the traffic stop progressed, additional circumstances arose that would justify prolonging the stop further and searching the entire passenger compartment for weapons.[5] Officer Joyner testified that he saw a firearm on the floorboard of the Impala. He could not specifically recall if he saw the firearm before or after he removed the driver from the vehicle, but he testified he saw the weapon within seconds of approaching the Impala. The dash cam video lends support to Officer Joyner's testimony in this regard. Shortly after he removed the driver, the video shows Officer Joyner looking back into the driver's side door briefly. Having had the opportunity to hear and observe Officer Joyner at the evidentiary hearing, and having considered the objective evidence as depicted in the dash cam video, the undersigned credits Officer Joyner's testimony that he observed a firearm on the floorboard of the Impala at about the time he removed the driver from the vehicle. The observation of a firearm, coupled with the other facts and circumstances discussed above, would reasonably justify further inquiry and a delay in the completion of the traffic stop. See Goodwin-Bey, 584 F.3d at 1120-21.

---

[5] To be clear, based on the movement of the driver and the other circumstances, Officer had reasonable suspicion to conduct at least a cursory check for weapons before and after he removed the driver from the Impala.

12

Valentine takes some issue with the length of time associated with the actual seizure of any firearms from the vehicle. The objective facts, however, do not support a conclusion that the officers delayed the stop longer than reasonably necessary. See Mosley, 878 F.3d at 254; see also United States v. Sanford, 813 F.3d 708, 713 (8th Cir.) (when conducting a Terry stop, officers are to use the least intrusive means necessary), cert. denied, 137 S. Ct. 260 (2016). Again, the undersigned has carefully reviewed the dash cam video and it appears that the officers conducted the stop expeditiously in the circumstances. Before searching the Impala for weapons, the officers removed all four occupants. This was proper and does not detract from the dangerousness of the situation. See Goodwin-Bey, 584 F.3d at 1120-21; see also Pope, 910 F.3d at 417 (explaining that the use of handcuffs and securing a suspect does not detract from officer safety concerns); Beatty, 170 F.3d at 813 (police may order occupants out of vehicle during traffic stop). Officer Joyner removed and secured the driver first and then he removed and secured the occupant in the rear seat on the driver's side. Officer Lacy first removed and secured Valentine from the back seat on the passenger's side, and then he removed the front seat passenger. All four occupants were moved to the rear of the Impala. Based on the time stamp on the dash cam video, Officer Joyner first opened the driver's door at about 20:38:58 and the last occupant was taken out at about 20:41:30. Thus, a total of less three minutes elapsed from the time Officer Joyner first saw a firearm until the occupants were removed and it was safe to return and retrieve the firearm.[6]

After the four occupants were removed, the dash cam video shows Officer Joyner returning to the driver's door and searching the vehicle from the driver's compartment. The

---

[6] The undersigned does not interpret Valentine's motion to suppress as arguing that the police could not seize a firearm observed in plain view during this traffic stop. In any event, as discussed above, Valentine lacks standing to contest the search of the Impala.

13

video shows Officer Joyner initially lean into the car at 20:41:43 and then emerge back out. He then re-entered more fully inside the driver's compartment and emerged back out at about 20:42:13, and thereafter the video shows him taking a handgun back to patrol car. The video, therefore, indicates that Officer Joyner required about 30 seconds search the driver's compartment and seize the first firearm. The total elapsed time from the moment he removed the driver to when he seized the first firearm was less than four minutes.[7]

Although it took several additional minutes to seize the remaining firearms from rear passenger compartment, the dash cam video shows that the search was conducted in a reasonably expeditious manner and limited to areas of the passenger compartment where a weapon might reasonably be concealed. See Goodwin-Bey, 584 F.3d 110. The fact that one gun had been recovered certainly would not preclude the possibility that the occupants had discarded or hidden other firearms inside the Impala. In fact, on the specific facts of this case, a reasonably prudent officer would be justified in looking for firearms in the back seat area.

In this regard, Officer Joyner's observations at the outset of the encounter provided additional circumstances for an office to reasonably believe that there might be a weapon hidden in the back seat area of the Impala.[8] In particular, Officer Lacy testified that, during the traffic stop, he was responsible for the two occupants on the passenger side of the Impala. Officer Lacy testified that he observed the rear passenger (Valentine) attempt to open the door as if attempting to flee. The dash cam video does not clearly confirm or refute whether Valentine tried to open the door and flee. The view of that passenger side of the Impala is not clearly visible in the

---

[7] The dash cam video shows that, while Officer Joyner was searching the driver's compartment, Officer Lacy was watching the four occupants at the rear of the car.

[8] Officer Lacy searched the back seat area where Valentine had been after Officer Joyner seized the first handgun.

14

video and the front seat passenger obstructs the view through the windshield to the backseat

Nonetheless, the undersigned credits Officer Lacy's testimony for at least three reasons.  First, the undersigned observed Officer Lacy as he testified at the evidentiary hearing and finds him to be credible.  Second, the video shows Officer Lacy approach the Impala from the front on the passenger side.  The video clearly shows that he moved quickly past the front seat passenger directly to the rear passenger door.  The video shows him addressing some situation at the rear passenger door.  Thus, the circumstantial evidence apparent in the video corroborates Officer Lacy's testimony because it shows his primary concern at the outset of the traffic stop was not the closest occupant, but rather the rear passenger—Valentine.  Third, Officer Joyner testified that he heard Officer Lacy yell, "Keep that door closed, keep the door closed." (Tr. 9-10)  The undersigned therefore credits Officer Lacy's testimony that he observed Valentine try to open the rear passenger door in a possible attempt to flee.  This additional fact, coupled with the other facts and circumstances would justify extending the duration of the traffic stop to search the rear passenger compartment for weapons.

## CONCLUSION AND RECOMMENDATION

For the reasons set forth above, the undersigned finds that Officers Joyner and Lacy had probable cause to conduct a lawful traffic stop of the Impala for a traffic violation.  The undersigned further finds that Officers Joyner and Lacy had reasonable suspicion to extend the traffic stop and conduct a search for weapons.  Based on discovering a firearm during an initial search of the driver's compartment and the officers' observations, the officers had at least reasonable suspicion sufficient to search the entire passenger compartment of the Impala for weapons.

Accordingly,

**IT IS HEREBY RECOMMENDED** that Defendant Hakeem Valentine's Motion to Suppress Evidence [ECF No. 23] be **DENIED**.

The parties are advised that they have fourteen (14) days in which to file written objections to the foregoing Report and Recommendation unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact.  See Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990).  see also 28 U.S.C. § 636(b)(1)(A), Fed. R. Crim. P. 59(a).

This matter is set for trial on May 9, 2019, at 3:30 p.m. in Courtroom 3-North before the Honorable Stephen N. Limbaugh, Jr., United States District Judge.


/s/ *John M. Bodenhausen*
JOHN M. BODENHAUSEN
UNITED STATES MAGISTRATE JUDGE

Dated this  29th   day of March, 2019.